RECEIVED
USDC, WESTERN DISTRICT OF LA
TONY R. MOORE, CLERK
ALEXANDRIA, LOUISIANA
DATE 7 13 11
BY _____

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

ALEXANDRIA DIVISION

OSCAR A. KIERUM II,                   CIVIL ACTION
          Appellant                    1:10-CV-01057

VERSUS

SOCIAL SECURITY ADMINISTRATION        JUDGE DEE D. DRELL
COMMISSIONER,                         MAGISTRATE JUDGE JAMES D. KIRK
          Appellee


REPORT AND RECOMMENDATION OF MAGISTRATE JUDGE


Oscar A. Kierum II ("Kierum") filed an application for disability insurance benefits ("DIB") on January 2, 2008, alleging a disability onset date of February 17, 2005 (when he was 52 years old) (Tr. p. 55) due to problems with both shoulders, left wrist, neck, right arm and hand, and trouble standing (Tr. p. 64). Kierum was granted benefits pursuant to a finding by the Social Security Administration ("SSA") that Kierum became disabled on August 24, 2007 (Tr. p. 11). Kierum requested a hearing on the issue of whether he was disabled before August 24, 2007.

A hearing was held before an administrative law judge ("ALJ") on August 18, 2009 (Tr. p. 484), at which Kierum appeared with his attorney and a vocational expert ("VE"). The ALJ found that, although Kierum had severe impairments of status post left shoulder arthroscopic surgery, status post ACDF at C5-6 and C6-7, mild degenerative changes in the knees bilaterally, and a left wrist

injury, he had the residual functional capacity to perform light work except as limited by Kierum's inability to reach overhead and limited gross manipulation with his left (non-dominant) hand (Tr. pp. 13-14).

Kierum requested a review of the ALJ's decision by the Appeals Council, but the Appeals Council declined to review it and the ALJ's decision became the final decision of the Commissioner of Social Security ("the Commissioner") (Tr. p. 4).

Kierum next filed this appeal for judicial review of the Commissioner's final decision. Kierum raises the following issues for appellate review (Doc. 14):

> 1. Whether Kierum was disabled from February 17, 2005 to August 24, 2007.
>
> 2. Whether the ALJ erred in refusing to admit the medical opinion testimony offered by Kierum on the ground that the evidence was introduced too late.

The Commissioner filed a brief in response to Kierum's appeal (Doc. 16). Kierum's appeal is now before the court for disposition.

<u>Summary of Pertinent Facts</u>

1. Medical Records

Kierum was injured at work in June 2004 while trying to catch a heavy object (Tr. pp. 124, 128, 130-132). Dr. John S. McCabe, a reconstructive and plastic surgeon specializing in hands, diagnosed a left wrist injury and a shoulder injury, both of which occurred at the time of the original injury (Tr. p. 124). In March 2005, Dr. McCabe stressed that Kierum must continue to rest his left wrist because even light use of it aggravated the original injury and resulted in significant pain in the ulnar side of his forearm

and wrist (Tr. p. 124).  In October 2005, Dr. Michael Heard, an orthopaedic surgeon, found left wrist tendonitis, left rotator cuff tear, left shoulder tendonitis, and left A/C arthrosis, and recommended conservative treatment (Tr. p. 267).

In September 2004, Kierum was in an auto accident in which he was rear-ended, causing neck, right arm, and low back pain (Tr. p. 273).  Kierum was initially treated by a chiropractor, Dr. Walter Creel (Tr. pp. 278-280).

An MRI of Kierum's cervical spine in March 2005 showed what appeared to be multi-level degenerative disc/osteophyte disease and facet arthropathy producing variable degrees of spinal canal and foraminal stenosis (Tr. pp. 94-95).  An MRI of Kierum's thoracic spine, in March 2005, also suggested multi-level degenerative disc disease of the thoracic spine and a small disc bulge at T4-5, T5-6, T6-7 T7-8, T8-9, T9-10, and T10-11 which produced mild anterior impression upon the dural sac without evidence of spinal canal stenosis, neural foraminal stenosis or spinal cord impingement (Tr. p. 97).

In April 2005, Kierum underwent a neurosurgical consultation (on referral from Dr. Walter Creel) with Dr. Michael Lawrence Drerup, a neurological surgeon, and was diagnosed with cervical radiculopathy right, probably secondary to degenerative disc disease at C5-6 and C6-7 (Tr. p. 148).  Dr. Drerup found Kierum had a full range of motion in his cervical spine, a normal range of motion and normal strength bilaterally in the upper extremities, and normal standing motor strength in both lower extremities (Tr.

pp. 148-153).   Kierum underwent epidural injections in May 2005 (Tr. pp. 109-110).   Kierum had a nerve conduction study and an EMG in August 2005 which showed a probable mild degree of C6-7 radiculopathy (Tr. p. 134).   In October 2005, Dr. Drerup again examined Kierum and recommended a cervical spine series, EMG and nerve conduction studies, and a nerve root block at C6-7 (Tr. pp. 148-1535).

In September 2005, Kierum was examined by Dr. Rick I. Ahmad, an orthopaedic surgeon specializing in hand surgery (Tr. pp. 138-141).   Dr. Ahmad stated that Kierum appeared to have a rotator cuff injury in his left shoulder that was directly related to his June 2004 work injury, and a symptomatic left extensor carpi ulnaris tendon subluxation (left wrist) which would not heal on its own with non-operative measures.   Dr. Ahmad stated Kierum needed to have an MRI of his left shoulder and repair of the damage, and required extensor carpi ulnaris tendon stabilization (of the left wrist) (Tr. p. 141).

An MRI of Kierum's left shoulder in October 2005 showed AC joint arthrosis without significant inferior spurring, mild lateral downsloping of the acromion causing a mildly reduced subacromion interval, either a small focal full thickness perforation or a Grade III partial thickness tear of the distal anterior fibers of the supraspinatus tendon, a Grade III partial thickness articular surface tear of the distal superior tear of the distal superior fibers of the subscapularis tendon, and a mild subacromion/subdeltoid bursitis (Tr. p. 276).

4

In November 2005, a post-myelogram CT cervical spine with sagittal reconstructions showed no focal compromise of the cord or neural foramen at C2-3, marked facet joint hypertrophy with some posterolateral osteophyte formation and severe left neural foraminal narrowing at C3-4, slight facet joint hypertrophy at C4-5, disc bulge with osteophytes and facet joint hypertrophy suggesting severe right neural foraminal stenosis, some impingement on the thecal sac and right cord and some narrowing of the left neural foramen at C5-6, osteophytes and facet joint hypertrophy with a minimal disc bulge with severe right neural foraminal narrowing and mild left neural foraminal narrowing at C6-7 (Tr. pp. 107-108, 111). It was concluded that Kierum had minimal spinal stenosis at C5-6 and C6-7, and significant and fairly severe neural foraminal stenosis at C5-6 and C6-7 (Tr. p. 108). Dr. Heard noted that Kierum was only approved for light and sedentary daily living activities, and was not able to work regular duty (Tr. p. 266).

In January 2006, Dr. Drerup diagnosed cervical radiculopathy at C6-7 secondary to degenerative disc disease at C5-6 and C6-7, which was recalcitrant to all medical therapy to date, including selective root block, and recommended surgery (Tr. pp. 143-44).

In April 2006, Dr. Heard found Kierum's left wrist subluxation was resolved, but he still had tendonitis, and Dr. Heard recommended conservative treatment (Tr. p. 259).

After two years of unsuccessful conservative treatments (Tr. pp. 222-223), in November 2006 Kierum underwent arthroscopic surgery with Dr. Peter D. Vizzi, an orthopedic surgeon, to repair

a left shoulder rotator cuff tear with subacromial impingement, a left shoulder anterior superior labral tear, and a left shoulder biceps tendon tear (Tr. pp. 155-192, 169-192, 216-220).   In December 2006, Dr. Vizzi released Kierum to a "desk-type job" with no lifting of his left arm (Tr. p. 211).   In February 2007, Kierum was released to medium duty work (Tr. p. 206).   In May 2007, Dr. Vizzi released Kierum to regular duty work with limited repetitive activity on his left arm due to residual weakness (Tr. pp. 203-204).

In January 2007, Dr. Heard noted Kierum's complaints of right and left knee pain, took x-rays, diagnosed mild degenerative changes with chronic strain, and prescribed Mobic for pain (Tr. p. 252).   Kierum continued to complain to Dr. Heard of knee pain through August 2007 (Tr. pp. 244, 247, 250).

An MRI of Kierum's left wrist was conducted again in June 2007 (Tr. p. 194).   Dr. David J. Jewell, a diagnostic radiologist, found the triangular fibrocartilage complex was torn near its radial attachment, there was a medical subluxation of the extensor carpi ulnaris tendon at the distal fibula and a Grade I interstitial tear of that tendon plus tenosynovitis fo the tendon sheath, the scapholunate ligament was stretched but not torn, and there was degenerative osteoarthritic change in the first MCP joint with joint space narrowing, mild lateral subluxation of the base of the first metacarpophalangeal, and bony eburnation at the joint (Tr. p. 194).   These findings corresponded substantially with Kierum's MRI from April 2006 (Tr. p. 195).   Dr. Michael Heard, an orthopedist,

then recommended pain medication and possible surgery of the left wrist to release the tendon sheath or for a release and repair (Tr. pp. 198, 245).

A functional capacity report in July 2007 by an occupational therapist and Dr. Peter Vizzi (Tr. pp. 200-202) found Kierum could frequently lift up to ten pounds and occasionally lift up to 25 pounds, carry up to 25 pounds frequently and up to 50 pounds occasionally, push/pull with minimal restrictions, bend, squat, climb stairs, and twist without restrictions, carry while climbing stairs with 30 pounds maximum in the right hand (due to left wrist pain), climb ladders with minimal restrictions on frequency, reach above shoulder level with minimal restrictions due to left shoulder pain, sit continuously for up to 2 hours, stand continuously for up to four hours, walk continuously for up to one hour, and alternately sit/stand/walk for up to eight hours, and can use his hands to grasp and do fine manipulation (Tr. pp. 200-201). The conclusion was that Kierum could not return to his former heavy level job, but may be able to perform medium level work, though he may not be able to do so for a 40 hour work week (Tr. pp. 201-202).

In August 2007, Dr. Anil Nanda, a neurosurgeon, noted Kierum had been in an auto accident in 2004 which resulted in bulging discs at C5-6 and C6-7 and did not respond to conservative therapy for neck pain (Tr. pp. 226, 229). Dr. Nanda performed an anterior cervical fusion (Tr. pp. 229-234).

X-rays in November 2007 showed no malalignment with motion of Kierum's C5-6 and C6-7 levels after the fusion (Tr. p. 241).

However, pain in Kierum's upper right arm, with numbness and tingling in his right hand, returned in October and progressively worsened (Tr. p. 237). Kierum had good motor strength in both arms and legs with normal reflexes and downgoing toes (Tr. p. 237). Dr. Heard found Kierum had in his left wrist (extensor carpi ulnaris tendonitis and subluxation), prescribed Mobic for pain, and recommended surgery (Tr. pp. 243, 245-246).

A physical residual functional capacity assessment was filled out for Kierum on January 30, 2008 by "Libby Ashlock," a non-examining, non-physician medical consultant, who found Kierum has a limited ability to reach in any direction, can only lift/carry up to ten pounds, and can only occasionally balance or crawl (Tr. pp. 281-283).

2. 2009 Administrative Hearing

At Kierum's May 2009 administrative hearing, Kierum's attorney attempted to introduce depositions from Kierum's physicians, which had been taken in 2006 and 2007 for Kierum's personal injury and worker's compensation lawsuits (Tr. p. 436). The ALJ refused to accept the depositions, stating they were being offered "too late" and she did not have time to review them, and she also refused to postpone the hearing on the ground that "postponement is not an option nowadays because there are 5,800 people waiting for, for a hearing" (Tr. pp. 486-487). Kierum objected and the ALJ accepted his proffer of the depositions (Tr. p. 488).

At the hearing, Kierum testified that he was then 56 years old and was 52 years old at the onset of his disability (Tr. p. 489).

Kierum testified that he has a twelfth grade education and vocational training as a pipefitter, and he worked as a pipefitter from 1973 to February 17, 2005 (Tr. p. 490).

Kierum testified that he injured his left wrist and left shoulder at work in June 2004, at which time he was moved to light duty work in the warehouse; he was laid off on February 17, 2005 (Tr. pp. 490-491). Kierum further testified that, in September 2004, his vehicle was rear-ended in an accident and he suffered neck injuries (Tr. p. 491). Kierum testified that he began receiving worker's compensation in July 2006.

Kierum testified that his employer believed Dr. McCabe stated in a letter that Kierum's left wrist was essentially healed, at which point Kierum was laid off from work (Tr. pp. 492-493). Kierum testified that he explained what had happened to Dr. McCabe, who said the employer must have misunderstood him and then wrote another letter to the employer (Tr. p. 493).

In November 2006, Kierum had surgery on his left shoulder (Tr. p. 493). In February 2007, Kierum underwent a double fusion in his neck (Tr. pp. 492-493). Kierum testified he had surgery on his left wrist in February 2008;[1] he is right-handed (Tr. p. 492).

Kierum testified that, after the June 4, 2004 accident at work, he saw Dr. Gamburg the next day; Dr. Gamburg put Kierum's left hand and arm in a cast from his knuckles to his shoulder (Tr. p. 500). Kierum testified that he had the long cast for two weeks,

---

[1] The medical records from Kierum's left wrist surgery are not in the administrative record.

then a shorter cast, from his knuckles to his elbow, for about three months (Tr. p. 501). Kierum was next treated by Dr. John McCabe, who recommended surgery on Kierum's wrist (Tr. pp. 502-503). Dr. McCabe then ordered an MRI and sent Kierum to Dr. Gamburg for evaluation of his shoulder pain, but worker's compensation refused to pay for the shoulder MRI (Tr. p. 503). Kierum successfully sued the worker's compensation insurer and underwent shoulder surgery by Dr. Vizzi and wrist surgery by Dr. Heard (Tr. p. 503).

Kierum also testified that, after the auto accident, he was initially treated by Dr. Creel, a chiropractor (Tr. p. 502), but was referred by him to Dr. Drerup (Tr. p. 504). Dr. Drerup then referred Kierum to Dr. Rice for injections to treat the pain in his neck, right shoulder, right arm, and right hand; the medicine lasted a week or two before the pain recurred (Tr. pp. 497, 504). After conservative treatments failed, Dr. Drerup recommended surgery, and Dr. Nanda performed the surgery on Kierum's neck in August 2007 (Tr. pp. 494-495, 505).

Kierum testified that he was put on light duty in the warehouse at work while his arm was in a cast and was told not to do any lifting (Tr. pp. 501-502). Kierum also suffered his neck injury from the automobile accident while he was working in the warehouse (Tr. p. 502). Kierum testified that, while he was working in the warehouse, he continued to be paid his pipefitter wages (Tr. p. 501), and he was laid off while he was working in the warehouse (Tr. p. 502).

Kierum testified that, after he was laid off, between February 2005 and August 2007 he did not work; usually, Kierum would have coffee in the morning and watch the news, visit family and friends (those who lived nearby more than those who lived in Denham Springs), and try to do a little housework, but his shoulder, wrist, and neck pain prevented him from doing very much (Tr. pp. 494, 496, 507). Kierum testified that he had shoulder pain when he lifted something or sometimes when he was just sitting (Tr. p. 495). Kierum testified that the pain interfered with his ability to concentrate (Tr. p. 505). Kierum testified he was not able to do much work outside, either (Tr. p. 495). Kierum testified that he cooked, did his laundry and dishes, and did his grocery shopping, but sometimes he would have to stop, sit down, and take ibuprofen or aspirin for pain (Tr. pp. 495-496). Kierum testified that he would usually have to sit in his recliner three or four times a day (Tr. pp. 505-506). Kierum testified that his neck injury gave him the most pain, then his shoulder, then his wrist (Tr. p. 506). Kierum could carry a small Wal-Mart grocery bag in each hand (Tr. p. 496). Kierum testified that he spent the rest of his time sitting around the house, and that he was no longer able to hunt and fish (Tr. pp. 496-497). Kierum had trouble sleeping, and was usually awake after two or three hours (Tr. p. 497). Kierum testified that he could sometimes lift from the floor up to about waist high, perhaps thirty pounds, but sometimes he was not able to lift anything (Tr. p. 497). Kierum testified that he had trouble holding things in his left hand due to his wrist injury and

11

trouble holding things with his right hand (Tr. p. 498). Kierum also testified that he could not sit and pay bills for an extended period of time, or sit at a desk doing paperwork because his neck would start "seizing up" and he would have to lie down (Tr. p. 506). Kierum could drive about thirty minutes into town (Tr. p. 497). Kierum testified that he had to use his rearview mirror more than turning and looking back when he drove, and he tried not to drive any more than necessary (Tr. p. 506).

Kierum testified that he could not do any work or activity for five days a week, six to eight hours a day, after his November 2006 shoulder surgery and before his August 2007 neck surgery (Tr. p. 507). Kierum testified that, after his shoulder surgery, Dr. Vizzi put Kierum in physical therapy for three to six months (Tr. p. 507).

At the administrative hearing, the VE testified that Kierum's prior work as a pipefitter was heavy, skilled (SVP 7) work, and his work in the warehouse as a "tool crib attendant" was medium, skilled (SVP 5) work (Tr. p. 510). The VE further testified that Kierum's work skills would not transfer to light or sedentary work (Tr. p. 511).

The ALJ posed a hypothetical, asking the VE to assume a person of Kierum's age, education, and work experience, who can perform light work with no overhead reaching and who is limited to no more than gross manipulation with the non-dominant left hand (Tr. p. 512). The VE testified that such a person could not do Kierum's past relevant work, but could work as a courier/messenger (light

duty, 100,820 jobs in the national economy and 1520 in Louisiana),
an information clerk (light duty, 1,100,790 jobs in the national
economy and 16,630 in Louisiana), and a file clerk (light duty,
214,590 jobs in the national economy and 2310 in Louisiana) (Tr. p.
512).  The VE testified that those jobs only require short on-the-
job training and regular attendance at work (Tr. p. 514).  Also,
those jobs would not allow more than two daily breaks plus a lunch
hour (Tr. p. 514).

Kierum then posed a second hypothetical, asking the VE to
assume the same person as in the first hypothetical, but with the
added limitation of a limited range of motion in the neck, a
sporadic inability to hold things in the right hand, and limited
lifting with the left upper extremity (Tr. p. 513).   The VE
testified that such a person would not be able to do any type of
work (Tr. p. 514).

### 3. Proffered Deposition Evidence

Dr. Douglas L. Gamburg, an orthopaedic surgeon, testified in
deposition in May 2006 that he began treating Kierum in June 2004,
the day after Kierum was injured in an accident at work (Tr. pp.
385-387).  Dr. Gamburg diagnosed a subluxation or dislocation of
the extended carpio ulnaris tendon at the location of the ulna
styloid (left wrist) and began conservative treatment with a long-
arm cast for three weeks (Tr. pp. 389-390, 463-464).   Kierum
returned to light-duty work on June 9, 2004, with his arm in a cast
(Tr. p. 390), but the subluxation of his left wrist recurred after
the cast was removed, indicating a need for surgical repair (Tr. p.

13

390).

Dr. Gamburg again saw Kierum in December 2004 for left shoulder pain, on referral from Dr. McCabe. Dr. Gamburg found mild acromion clavicular arthritis and a post-traumatic supraspinatus tendinitis, and he ordered an MRI of his left shoulder to try to determine whether he had a damaged rotator cuff, but never saw Kierum again (Tr. pp. 393-395). Dr. Gamburg also stated that Kierum could have left shoulder tendinitis in the rotator cuff, caused by having to wear a heavy cast on his wrist and keep his arm immobilized after the accident at work (Tr. pp. 407-408).

Dr. McCabe testified at his deposition that he does plastic and reconstructive surgery, and saw Kierum on referral from Dr. Gamburg in July 2004 (Tr. pp. 430-431). Dr. McCabe agreed with Dr. Gamburg that Kierum's wrist injury required surgical repair (Tr. p. 432). In October 2004, Dr. McCabe noted Kierum's left shoulder pain and stated that it had to be evaluated before proceeding with the left wrist surgery (Tr. pp. 432-433). In February 2005, Dr. McCabe noted Kierum's wrist problems were gradually improving on their own, but found significant problems with his left shoulder, particularly on abduction, which he believed was due to a rotator cuff tear (Tr. pp. 435, 437, 442, 445, 449, 465). Dr. McCabe stated it would be improper to perform the wrist surgery until the problem with Kierum's shoulder was understood, since it was on the same extremity (Tr. p. 446). Dr. McCabe stated that his surgical practice did not include the shoulder, so he referred Kierum back to Dr. Gamburg (Tr. p. 441).

14

Dr. Ahmad, an orthopaedic surgeon, testified in his 2006 deposition that he evaluated Kierum in August 2004, about five or six weeks after his left arm cast was removed (Tr. p. 476).  Dr. Ahmad agreed that surgery was necessary on Kierum's left wrist (Tr. p. 476).  In September 2011, Dr. Ahmad found Kierum's complaints of left shoulder pain were due to an increase in activity since his left arm was no longer immobilized (Tr. p. 476).

Dr. Walter Perry Creel testified at his June 2007 deposition that he is a chiropractor and that he started treating Kierum in September 2004 for neck and right shoulder problems from hi automobile accident (Tr. p. 370).  Dr. Creel explained that Kierum had cervicobrachial, or radiating, pain (Tr. p. 374).  Dr. Creel treated Kierum's neck and shoulder with manipulation and heat through March 2005, until it was established by an MRI that Kierum had a bulging disk in his neck (Tr. pp. 370-371).  Dr. Creel then referred Kierum to Dr. Drerup for his neck  and shoulder treatment (Tr. p. 371), but began treating Kierum in September 2005 for low back pain (Tr. p. 371).

In his June 2007 deposition, Dr. Anil Nanda testified that he is the Chairman of the Department of Neurosurgery at LSU-Shreveport and is a neurosurgeon (Tr. p. 290).  Dr. Nanda first examined Kierum in 2006, to offer a second opinion as to Dr. Drerup's recommendation of surgery, when Kierum was 53 years old and had a large disk at C5-6 and C6-7 (Tr. p. 291).  Dr. Nanda explained that surgeries were only performed if the person could not live with the disk, so he prescribed physical therapy (Tr. p. 291).  However, if

15

Kierum had already undergone unsuccessful epidural steroid injections with Dr. Drerup, then surgery would be necessary (Tr. p. 293). Dr. Nanda testified that, because Kierum had cervical problems from C5 going down his left side several years previously, which subsided, he definitely had an asymptomatic preexisting degenerative condition in his neck which became symptomatic after the auto accident (Tr. pp. 291-292).[2]

### ALJ's Findings

To determine disability, the ALJ applied the sequential process outlined in 20 C.F.R. §404.1520(a) and 20 C.F.R. §416.920(a). The sequential process required the ALJ to determine whether Kierum (1) is presently working; (2) has a severe impairment; (3) has an impairment listed in or medically equivalent to those in 20 C.F.R. Pt. 404, Subpt. P, App. 1 ("Appendix 1"); (4) is unable to do the kind of work he did in the past; and (5) can perform any other type of work. If it is determined at any step of that process that a claimant is or is not disabled, the sequential process ends. A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis. Greenspan v. Shalala, 38 F.3d 232, 236 (5th Cir. 1994), cert. den., 914 U.S. 1120, 115 S.Ct. 1984, 131 L.Ed.2d 871 (1995), citing Lovelace v. Bowen, 813 F.2d 55, 58 (5th Cir.1987).

To be entitled to benefits, an applicant bears the initial

---

[2] Dr. Nanda performed Kierum's cervical fusion shortly after his deposition, in August 2007.

16

burden of showing that he is disabled.  Under the regulations, this
means that the claimant bears the burden of proof on the first four
steps of the sequential analysis.  Once this initial burden is
satisfied, the Commissioner bears the burden of establishing that
the claimant is capable of performing work in the national economy.
Greenspan, 38 F.3d at 237.

     In the case at bar, the ALJ found that Kierum has not engaged
in substantial gainful activity since February 17, 2005 (Tr. p.
13), that his disability insured status expired on December 31,
2010 (Tr. p. 13), and that he has severe impairments of status post
left shoulder arthroscopic surgery, status post ACDF at C5-6 and
C6-7, mild degenerative changes in the knees bilaterally, and a
left wrist injury, but that he does not have an impairment or
combination of impairments listed in or medically equal to one
listed in Appendix 1 (Tr. p. 13).  The ALJ also found that Kierum
is unable to perform his past relevant work as a pipefitter (Tr.
pp. 17, 65).

     At Step No. 5 of the sequential process, the ALJ further found
that Kierum has the residual functional capacity to perform light
work except as limited by Kierum's inability to reach overhead and
limited gross manipulation with his left (non-dominant) hand (Tr.
pp. 13-14).  The ALJ also found that Kierum is an individual
closely approaching advanced age, with a high school education and
that the transferability of his work skills was immaterial (Tr. p.
17).  The ALJ concluded there are a jobs existing in substantial
numbers in the national and state economies which Kierum can still

17

perform, such as courier/messenger, information clerk, and file clerk, and therefore Kierum was not under a "disability" as defined in the Social Security Act at any time through the date of the ALJ's decision on June 25, 2009 (Tr. pp. 17-18).

### Scope of Review

In considering Social Security appeals such as the one that is presently before the Court, the Court is limited by 42 U.S.C. §405(g) to a determination of whether substantial evidence exists in the record to support the Commissioner's decision and whether there were any prejudicial legal errors.  McQueen v. Apfel, 168 F.3d 152, 157 (5th Cir. 1999).  For the evidence to be substantial, it must be relevant and sufficient for a reasonable mind to support a conclusion; it must be more than a scintilla but need not be a preponderance.  Falco v. Shalala, 27 F.3d 160, 162 (5th Cir. 1994), citing Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 482 (1971).  Finding substantial evidence does not involve a simple search of the record for isolated bits of evidence which support the Commissioner's decision but must include a scrutiny of the record as a whole.  The substantiality of the evidence must take into account whatever in the record fairly detracts from its weight.  Singletary v. Bowen, 798 F.2d 818, 823 (5th Cir. 1986).

A court reviewing the Commissioner's decision may not retry factual issues, reweigh evidence, or substitute its judgment for that of the fact-finder.  Fraga v. Bowen, 810 F.2d 1296, 1302 (5th Cir. 1987); Dellolio v. Heckler, 705 F.2d 123, 125 (5th Cir. 1983).

The resolution of conflicting evidence and credibility choices is for the Commissioner and the ALJ, rather than the court. Allen v. Schweiker, 642 F.2d 799, 801 (5th Cir. 1981). Also, Anthony v. Sullivan, 954 F.2d 289, 295 (5th Cir. 1992). The court does have authority, however, to set aside factual findings which are not supported by substantial evidence and to correct errors of law. Dellolio, 705 F.2d at 125. But to make a finding that substantial evidence does not exist, a court must conclude that there is a "conspicuous absence of credible choices" or "no contrary medical evidence." Johnson v. Bowen, 864 F.2d 340 (5th Cir. 1988); Dellolio, 705 F.2d at 125.

<u>Law and Analysis</u>

Kierum contends the ALJ erred in finding he was not disabled from February 17, 2005 to August 24, 2007, and in refusing to admit the medical opinion testimony (depositions) proffered by Kierum on the ground that the evidence was introduced too late. Kierum contends the ALJ violated the procedural rules for Social Security administrative hearings set forth in HALLEX, the "Hearings, Appeals and Litigation Law Manual."

Kierum attempted to introduce five depositions from treating or examining physicians, Dr. Nanda, Dr. Creel, Dr. Gamburg, Dr. McCabe, and Dr. Ahmad, into evidence at the beginning of his administrative hearing (Tr. pp. 448-489). The ALJ rejected the evidence, stating the depositions were "not timely filed" because they were available in 2006 and 2007, after Kierum filed his application and prior to his hearing, and she did not have the time

to review them (Tr. p. 436).   Kierum's attorney admitted he had just realized that the depositions of some of Kierum's doctors, who had been deposed in Kierum's personal injury and worker's compensation cases, might be helpful in his social security case (Tr. p. 487), and the ALJ acknowledged they "would have been beneficial" if they had been brought to her timely (Tr. p. 487). When Kierum's attorney stated he had already suggested postponing the hearing, the ALJ responded that postponement was no longer an option due to the large numbers of people waiting for hearings (Tr. p. 487).   The ALJ then allowed Kierum to object and proffer the depositions to have them included in the record (Tr. p. 488).

The ALJ clearly abused her discretion and erred in failing to admit and consider the proffered medical evidence.   Evidence offered at the administrative hearing is not untimely.   20 C.F.R. §§ 404.944, 410.640, 410.641.   Section 404.944 states that "[a] hearing is open to the parties and to other persons the administrative law judge considers necessary and proper.   At the hearing, the administrative law judge looks fully into the issues, questions you and the other witnesses, and accepts as evidence any documents that are material to the issues."   Section 410.640 states that "[t]he Administrative Law Judge shall inquire fully into the matters at issue and shall receive in evidence the testimony of witnesses and any documents which are relevant and material to such matters.   If the Administrate Law Judge believes that there is relevant and material evidence available which has not been presented at the hearing, the Administrative Law Judge may adjourn

the hearing or, at any time prior to the mailing of notice of the decision, reopen the hearing for the receipt of such evidence." Section 410.641 states that "[e]vidence may be received at the hearing even though inadmissible under rules of evidence applicable to court procedures."  Finally, 20 C.F.R. § 404.1527(d) states that every medical opinion received will be considered in making the disability determination, and Section 404.1527(f)(2) states the ALJ is responsible for reviewing the evidence and making findings of fact and conclusions.  It is also noted that an administrative law judge has a duty to fully and fairly develop the facts relative to a claim for disability benefits. <u>Carey v. Apfel</u>, 230 F.3d 131, 142 (5th Cir. 2000); <u>Brock v. Chater</u>, 84 F.3d 726 (5th Cir. 1996); <u>Kane v. Heckler</u>, 731 F.2d 1216 (5th Cir. 1984).

As Kierum points out, the ALJ also failed to follow the SSA's own internal rules and procedures when she excluded his evidence at his hearing.  Evidence relevant to the applicant's claim is adduced at the administrative hearing.  HALLEX I-2-6-56 (9/2/2005); HALLEX I-2-6-58 (9/2/2005); 20 C.F.R. § 404.944; 20 C.F.R. §§ 404.1512, 416.912(b).  The Fifth Circuit has held that, "[w]hile HALLEX does not carry the authority of law,... 'where the rights of individuals are affected, an agency must follow its own procedures, even where the internal procedures are more rigorous than otherwise would be required.  If prejudice results from a violation, the result cannot stand." <u>Newton v. Apfel</u>, 209 F.3d 448, 459 (5th Cir. 2000), citing <u>Schweiker v. Hansen</u>, 450 U.S. 785, 789, 101 S.Ct. 1468 (1981).

In the case at bar, the ALJ clearly used the excuse of

untimeliness to spare herself the inconvenience of examining additional evidence. Unfortunately, it was not a valid excuse; pursuant to the Code of Federal Regulations, as well as the SSA's own internal procedures, the hearing was a proper time for Kierum to offer additional medical records into evidence, especially when it involved testimony of one of the doctors, Dr. Nanda, who performed surgery on Kierum.

Not only did the ALJ not consider Kierum's treating physicians' depositions (they are not referred to in her opinion), but, in her opinion, the ALJ considered only the medical evidence from Dr. Heard, Dr. Vizzi, Dr. McCabe, and Dr. Nanda (Tr. pp. 14-16). The ALJ did not mention any of the medical evidence from Dr. Drerup, Dr. Creel, or Dr. Ahmad,[3] despite the fact that it was admitted into evidence. It is unclear whether the ALJ ignored, overlooked, or disregarded that evidence, since there is absolutely no mention of it in either her summary of the medical evidence or her analysis of Kierum's residual functional capacity. Regardless of the reason, the ALJ erred.

An ALJ must consider the following factors before declining to give any weight to the opinions of a treating doctor: length of treatment, frequency of examination, nature and extent of relationship, support provided by other evidence, consistency of opinion with record, and specialization. Myers, 238 F.3d 617, 621 (5th Cir. 2001), citing Newton v. Apfel, 209 F.3d 448, 456 (5th Cir.

---

[3] There are no medical records from Dr. Gamburg that were admitted into evidence prior to the hearing.

2000).    As for a physician who only examined and evaluated a claimant, the weight to be given a physician's statement is dependent upon the extent it is supported by specific clinical findings.    The ALJ cannot reject a medical opinion without an explanation.    See Strickland v. Harris, 615 F.2d 1103, 1110 (5th Cir. 1980), citing Goodley v. Harris, 608 F.2d 234, 236 (5th Cir. 1979).    Therefore, the ALJ should have explained her decision to give the examining physicians' statements no weight.

The issue in this case is whether Kierum was disabled from February 17, 2005 to August 24, 2007.    The ALJ's failure to consider about half of the medical evidence in this case (some of which had been admitted by the ALJ) makes it impossible for the court to review the ALJ's/Commissioner's decision that Kierum was not disabled.    Compare, Fargnoli v. Massanari, 247 F.3d 34, 42 (3d Cir. 2001), ("Although we do not expect the ALJ to make reference to every relevant treatment note in a case where the claimant, such as Fargnoli, has voluminous medical records, we do expect the ALJ, as the factfinder, to consider and evaluate the medical evidence in the record consistent with his responsibilities under the regulations and case law.    His failure to do so here leaves us little choice but to remand for a more comprehensive analysis of the evidence consistent with the requirements of applicable regulations and the law of this Circuit... .").

Therefore, this court cannot determine whether the unmentioned evidence, that was admitted, was not given any weight or was simply ignored.    Moreover, the unadmitted deposition evidence was excluded

in error and should haven been considered.  Since the ALJ did not fulfill her duty to fully and fairly review all of the medical evidence in Kierum's case, the final decision of the Commissioner is not supported by substantial evidence.

However, this does not entitle Kierum to a decision in his favor based upon the existing record.  The record is simply inconclusive as to whether Kierum is disabled or whether there are any jobs existing in sufficient numbers in the national economy which he can perform, given his true impairments.  Therefore, Kierum's case should be remanded to the Commissioner for further proceedings.

<u>Conclusion</u>

Based on the foregoing discussion, IT IS RECOMMENDED that Kierum's appeal be GRANTED, the final decision of the Commissioner be REVERSED, and Kierum's case be REMANDED to the Commissioner for further proceedings.

Under the provisions of 28 U.S.C. § 636(b)(1)(c) and Fed.R.Civ.P. 72(b), the parties have **fourteen (14) business days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court.  A party may respond to another party's objections within **fourteen (14) days** after being served with a copy thereof.  A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of filing.  Timely objections will be considered by the district judge before he makes a final ruling.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED**

FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN fourteen(14) BUSINESS DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.

THUS DONE AND SIGNED at Alexandria, Louisiana, on this _____ day of July, 2011.

JAMES D. KIRK
UNITED STATES MAGISTRATE JUDGE